MELLON, Secretary of the Treasury of the United States, v. MINNEAPOLIS, ST. P. & S. S. M. RY. CO. et al.*

(Court of Appeals of District of Columbia. Submitted December 10, 1925. Decided February 1, 1926.)

No. 4273.

1. Judgment ⬤⇒585(5)—Decree rendered without consideration of statute held not determinative of rights thereunder, though statute was adopted before its rendition (Act Feb. 13, 1911, § 5; as amended by Act Feb. 7, 1920 [Comp. St. Ann. Supp. 1923, § 5571]; Tariff Act 1922 [42 Stat. 858]).

Decree enjoining Secretary of the Treasury from requiring railroads to pay for overtime services of customs inspectors at international boundary under Act Feb. 13, 1911, § 5, as amended by Act Feb. 7, 1920 (Comp. St. Ann. Supp. 1923, § 5571) though rendered after passage of Tariff Act of 1922, *held* not determinative of Secretary's rights thereunder, when rendered without consideration of that act.

2. Customs duties ⬤⇒92—Railroads crossing international boundary held liable for overtime compensation of customs officials (Tariff Act 1922, §§ 401, 450, 451 [Comp. St. Ann. Supp. 1923, §§ 5841d, 5841e19, 5841e20]; Act Feb. 13, 1911, §§ 1–4 [Comp. St. §§ 5559–5562], and section 5 as amended by Act Feb. 7, 1920 [Comp. St. Ann. Supp. 1923, § 5571]).

Under Tariff Act 1922, § 401 (Comp. St. Ann. Supp. 1923, § 5841d), defining vehicles, and sections 450 and 451 (sections 5841e19, 5841e20), requiring owner of "vessel or vehicle" to pay extra compensation for overtime services of customs inspectors in accordance with Act Feb. 13, 1911, § 5, as amended by Act Feb. 7, 1920 (Comp. St. Ann. Supp. 1923, § 5571), railroads crossing international boundary liable for overtime compensation, though Act 1911, §§ 1–4 (Comp. St. §§ 5559–5562), applicable only to "vessels and conveyances," was inapplicable to railroads.

3. Internal revenue ⬤⇒6—Requirement that railroads pay extra compensation for overtime services of customs inspectors held invalid, as direct tax levy (Tariff Act 1922, §§ 401, 450, 451 [Comp. St. Ann. Supp. 1923, §§ 5841d, 5841e19, 5841e20]).

Tariff Act 1922, §§ 401, 450, 451 (Comp. St. Ann. Supp. 1923, §§ 5841d, 5841e19, 5841e20), requiring railroads to pay extra compensation for overtime services of customs officials at international boundary, *held* not an attempt to levy a direct tax, invalid for want of apportionment.

4. Customs duties ⬤⇒10—Requirement that railroads pay extra compensation for overtime services of customs officials held not violative of Jay Treaty (Tariff Act 1922, §§ 401, 450, 451; Jay Treaty Nov. 19, 1794 [8 Stat. 116]).

Tariff Act 1922, §§ 401, 450, 451 (Comp. St. Ann. Supp. 1923, §§ 5841d, 5841e19, 5841e20), requiring railroads to pay extra compensation for overtime services of customs officials at Canadian boundary, *held* not violative of Jay Treaty of November 19, 1794 (8 Stat. 116), as to right to import goods and mer-

*Certiorari denied 46 S. Ct. 630, 70 L. Ed. ——.

chandise into the United States, since treaty also provides for payment of duties, and implies reasonable enforcement and collection measures.

Appeal from the Supreme Court of the District of Columbia.

Suit by the Minneapolis, St. Paul & Sault Sainte Marie Railway Company against Andrew W. Mellon, Secretary of the Treasury of the United States, for injunction, wherein plaintiff filed a supplemental petition after decree rendered (285 F. 980, 52 App. D. C. 246), and wherein the New York Central Railway Company and others intervened, praying similar relief. From a decree denying a motion to dismiss the supplemental and intervening petitions and granting the relief prayed for, defendant appeals. Reversed and remanded.

Peyton Gordon, V. E. West, and J. P. Crawford, all of Washington, D. C., for appellant.

J. C. Adkins, J. I. Peyser, and T. D. Peyser, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

VAN ORSDEL, Associate Justice. On May 16, 1921, appellee Minneapolis, St. Paul & Sault Sainte Marie Railway Company filed a bill in equity in the Supreme Court of the District of Columbia to enjoin the Secretary of the Treasury from requiring it to pay extra compensation for overtime services of customs inspectors, in connection with the unlading, receiving, or examination of passengers' baggage at points on the international boundary between Canada and the United States, under authority of the Act of Congress of February 13, 1911, § 5, 36 Stat. 901, as amended by the Act of Congress of February 7, 1920, 41 Stat. 402 (Comp. St. Ann. Supp. 1923, § 5571). The court granted the injunction and on appeal to this court the decree was affirmed. Mellon v. Minneapolis, St. Paul & Sault Sainte Marie Railway, 285 F. 980, 52 App. D. C. 246.

The Secretary of the Treasury, acting under the authority assumed to be conferred upon him by the Tariff Act of September 21, 1922, 42 Stat. 858, undertook to collect the extra compensation for overtime services in disregard of the existing decree. Whereupon the appellee Minneapolis, St. Paul & Sault Sainte Marie Railway Company, on February 29, 1925, filed in the original suit

a supplemental petition, praying for an injunction to restrain the Secretary from enforcing such collection. An intervening petition was filed by the New York Central Railroad Company, Michigan Central Railway Company, Vermont Central Railway, Boston & Maine Railroad, Rutland Railroad Company, Delaware & Hudson Company, Great Northern Railroad Company, Northern Pacific Railway Company, Wabash Railway Company, and Spokane International Railway Company, praying similar relief. Motions to dismiss the supplemental and intervening petitions were interposed, which were denied, and, the Secretary electing to stand on these motions, a final decree was entered as prayed in the petitions. From this decree the case comes here on appeal.

The facts, briefly stated, are that the appellee railroads operate passenger trains, crossing the international boundary from Canada into the United States, and the injunction is to prevent the threatened withdrawal of services at night, on Sundays and holidays, unless appellees pay the extra compensation of customs inspectors for overtime services.

[1] It is urged that, inasmuch as the opinion of this court, affirming the decree of the court below in the original case, was not rendered until January 19, 1923, the decree in the original case became final after the passage of the Tariff Act of 1922, and, since the decree looks only to the future, it is binding upon the Secretary, regardless of the provisions of the Tariff Act. It is sufficient answer that the provisions of the Tariff Act were not called to the attention of the court in the original case; hence the decree had reference only to the act of 1911, as amended by the act of 1920, and would accordingly remain operative only for the purpose of enjoining the collection of compensation during the period those particular acts remained unmodified and in force.

[2] This brings us to the real question involved in this case—an interpretation of sections 450 and 451 of the Tariff Act (Comp. St. Ann. Supp. 1923, §§ 5841e19, 5841e20), in connection with section 5 of the act of February 7, 1920.

Section 450 of the Tariff Act provides as follows: "No merchandise, baggage, or passengers arriving in the United States from any foreign port or place, and no bonded merchandise or baggage being transported from one port to another, shall be unladen from the carrying vessel or vehicle on Sunday, a holiday, or at night, except under special license granted by the collector under such regulations as the Secretary of the Treasury may prescribe."

Section 451, provides as follows: "Before any such special license to unlade shall be granted, the master, owner, or agent, of such vessel or vehicle shall be required to give a bond in a penal sum to be fixed by the collector conditioned to indemnify the United States for any loss or liability which might occur or be occasioned by reason of the granting of such special license and to pay the compensation and expenses of the customs officers and employees whose services are required in connection with such unlading at night or on Sunday or a holiday in accordance with the provisions of section 5 of the act entitled 'An act to provide for the lading or unlading of vessels at night, the preliminary entry of vessels, and for other purposes,' approved February 13, 1911, as amended. In lieu of such bond the owner, or agent, of any vessel or vehicle or line of vessels or vehicles may execute a bond in a penal sum to be fixed by the Secretary of the Treasury to cover and include the issuance of special licenses for the unlading of vessels or vehicles belonging to such line for a period of one year from the date thereof."

Section 5 of the act of February 13, 1911, as amended by the act of February 7, 1920, reads as follows: "That the Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of inspectors, storekeepers, weighers, and other customs officers and employees who may be required to remain on duty between the hours of five o'clock post meridian and eight o'clock ante meridian, or on Sundays or holidays, to perform services in connection with the lading or unlading of cargo, or the lading of cargo or merchandise for transportation in bond or for exportation in bond or for exportation with benefit of drawback, or in connection with the receiving or delivery of cargo on or from the wharf, or in connection with the unlading, receiving, or examination of passengers' baggage, such rates to be fixed on the basis of one-half day's additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond 5 o'clock post meridian (but not to exceed two and one-half days' pay for the full period from 5 o'clock post meridian to 8 o'clock ante meridian), and two additional days' pay for Sunday or holiday duty. The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night

or on Sundays or holidays shall be granted to the collector of customs, who shall pay the same to the several customs officers and employees entitled thereto according to the rates fixed therefor by the Secretary of the Treasury."

Section 5 of the act of 1911, as amended, it will be observed, merely defines the method in which overtime pay shall be computed. The carriers against whom payment may be enforced are described in the first four sections of that act Comp. St. §§ 5559–5562. We held in the original case, interpreting these provisions of the act, that overtime pay could only be enforced against vessels or other conveyances transporting passengers and merchandise by water, and that it had no application to railroads whose trains entered the United States from contiguous territory during the nighttime, on Sundays, and on holidays. The agencies of transportation referred to in those sections, and under consideration in our former opinion, were described as vessels or other conveyances. By the provisions of the present Tariff Act of 1922, the first four sections of the act of 1911, as amended, have been repealed, and for a description of the agencies of transportation coming within the provisions of section 5, which has been incorporated by reference into the Tariff Act, we are relegated to sections 450 and 451 of the Tariff Act. It will be observed that the language there used is broader and more comprehensive than that used in the act of 1911, as amended. Instead of "vessel or conveyance," as used in the former act, we have the expression "vessel or vehicle." Vehicle is defined by section 401 of the Tariff Act (Comp. St. Ann. Supp. 1923, § 5841d) as follows: "The word 'vehicle' includes every description of carriage or other contrivance used, or capable of being used, as a means of transportation on land, or through the air."

It will be observed that, under this sweeping definition of the term "vehicle," there is presented an entirely different situation from that which confronted us in the original case. The language in its terms is broad enough to cover any sort of conveyance used in the transportation of passengers and merchandise, either by land or by water, or through the air. But it is insisted that, inasmuch as section 451 provides for the payment of the compensation and expense of customs officers and employees for overtime in accordance with the provisions of section 5 of the act of 1911, as amended, we are limited to section 5, as in the former case, where it was held that the compensation could not be enforced

against a railway company. We do not so interpret this provision of the statute. The reference to section 5 contained in section 451 relates merely to the manner in which the additional pay shall be computed, and by whom it shall be paid. It in no respect limits the scope of "vehicle," as used in the present act, to that of "conveyance," as used in the former act.

In the case of Port Huron & Sarnia Ferry Co. v. Lawson (D. C.) 292 F. 216, the court had under consideration the question of whether the overtime compensation could be collected from a ferry company operating between the United States and Canada. It was contended there, as here, that section 5 of the act of 1911, as amended, construed in connection with the first four sections of that act, applied only to "common carriers of bonded merchandise," and not to a ferry carrying passengers, and that this act could not be given a broader interpretation, when construed in the light of the Tariff Act. The court, referring to International Railway Co. v. Davidson, 42 S. Ct. 179, 257 U. S. 506, 66 L. Ed. 341, where, in the act of 1911, as amended, the words "vessel or other conveyance" were held as inappropriate to describe a toll bridge, but were limited "to the vessels for the immediate lading and unlading of whose cargo special licenses might be issued under the first four sections of said act," said:

"As, however, these four sections were repealed by the 1922 statute in question, what was said by the court in that connection has no application to the present situation. This is equally true of the discussion of the court concerning the numerous other statutes dealing with the bringing of merchandise and baggage into this country. * * * The careful consideration which has been given to the many and comprehensive sections of the Tariff Act of September 21, 1922, discloses no reason to doubt that sections 450 and 451 hereinbefore quoted are plain and unambiguous and should be interpreted and given effect in accordance with their explicit language."

We have no difficulty in reaching the conclusion that the Tariff Act of 1922 has so changed and modified the construction given by this court and the Supreme Court of section 5 of the act of 1911, as amended, that its provisions may be extended to include railroads carrying passengers with their baggage across the international boundary from Canada into the United States. The power here sought to be exercised by the Secretary of the Treasury in the collection of this com-

pensation is clearly authorized and injunction will not lie to restrain its exercise.

[3] It is urged that the statute under consideration is unconstitutional, in that it attempts to levy a direct tax, which is not apportioned among the several states according to the population thereof. With this contention we do not agree. This is not a tax directly imposed upon property, but more in the nature of an excise tax for the privilege of unlading under a special license. Knowlton v. Moore, 20 S. Ct. 747, 178 U. S. 41, 44 L. Ed. 969; Flint v. Stone Tracy Co., 31 S. Ct. 342, 220 U. S. 107, 145–152, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. In the Port Huron Ferry Company Case, the same question was raised, and the court said:

"The contention that the effect of the statute is to impose a tax upon vessel owners for a private purpose, namely, for the benefit of the customs officers and employees whose services are required in connection with the special unlading thus permitted, is equally without merit. Under the terms of the statute, the compensation for such overtime services is not paid by the licensee to such officers or employees, but to the collector of customs, who pays the extra compensation, which has been fixed by the Secretary of the Treasury, to those entitled thereto, according to the rate so fixed. In substance and essence the recipient of the special license so granted indemnifies and reimburses the Government for the additional liability and expense incurred by it by reason of the extra cost of granting this special license."

[4] It is insisted that the enforcement of the payment of the compensation required by the railroads by a threat of refusal to examine or inspect merchandise or passengers' baggage upon its arrival at the international boundary would be in violation of the Jay Treaty of 1794. . 8 Stat. 116. The real answer to this contention is that, while the treaty provides (article 3) that "all goods and merchandise whose importation into the United States shall not be wholly prohibited, may freely, for the purposes of commerce, be carried into the same," this provision of the treaty is limited by further provisions providing for the payment of duties upon merchandise carried between Canada and the United States, which implies the power to make provision for the collection of customs duties and the enforcement of reasonable regulations for carrying into effect the customs laws. This is reinforced by the fact that tariff laws have been in force almost continuously during the life of this treaty, both in Canada and the United States, and no question has arisen as to the enforcement being in violation of the provisions of the treaty.

The decree is reversed, with costs, and the cause is remanded for further proceedings not inconsistent with this opinion.